**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Thomas F. STOCKHEIMER, Leonard A. Peth, Harry Days and Mark Van Dyke, Defendants–Appellants.**

**Nos. 97–1939, 97–2017, 97–2018 and 97–2019.**

United States Court of Appeals, Seventh Circuit.

Argued April 1, 1998.

Decided Sept. 28, 1998.

Mel S. Johnson (argued), Karine Moreno–Taxman, Office of the United States Attorney, Milwaukee, WI, for Plaintiff–Appellee.

Edward John Hunt, Milwaukee, WI, for Stockheimer.

Christopher Lowe (argued), Milwaukee, WI, for Peth.

Douglas M. Bihler (argued), Bihler & Kurhl, Milwaukee, WI, for Days.

Hans Peter Koesser (argued), Kenosha, WI, for Van Dyke.

Before CUDAHY, FLAUM and EVANS, Circuit Judges.

CUDAHY, Circuit Judge.

Word got around that an organization called Family Farm Preservation (FFP) had developed a novel method of debt management—the Certified Money Order (CMO). Inquiring minds learned that for a suggested donation of $500, FFP would provide a packet of blank CMOs, and some sample documents illustrating how to use them. FFP's CMOs were a little larger than ordinary cur-

rency and were in the form of figure 1, below. FFP typically included a numbered receipt for certified mail and a return receipt card with each packet of CMOs.

Figure 1

According to the instructions FFP provided, a debtor could legally discharge a debt by sending a creditor a CMO filled out for the amount owed. Debtors were told to send the CMO by certified mail, and to use the identifying number on the certified mail receipt as the identifying number on the top of the CMO. (FFP used and recommended the use of certified mail as a means of documenting CMO transactions.) The CMO indicated that it could be redeemed by sending it to an FFP post office box in Tigerton, Wisconsin. If a lender who received a CMO sent it on to Tigerton, FFP would send the lender a "Certified Bankers Check" (CBC), about the size of a CMO and resembling figure 2. If the creditor returned the Certified Banker's Check to Tigerton for redemption, it would be returned stamped "paid in full." As far as FFP was concerned, at that point the transaction had been consummated.

Figure 2

Of course some creditors tried to avoid getting on the CMO merry-go-round in the first place by refusing to accept the CMO. FFP's packet included a cheeky form letter for this contingency. It began, "Thank you for surrendering the instrument, the Certified Money Order # _____, therefore *discharging my debt* pursuant to the Uniform Commercial Code 3.604 and 3.605." Other creditors stopped trying to play along at the point when they first received FFP's CBC. Creditors who refused to accept a CBC were likely to receive a rambling letter from FFP accusing them of fraud. In the end it did not matter what approach was taken: no creditor ever received anything of value by accepting a CMO. So it is not surprising that, while over the course of several years FFP provided CMOs to hundreds of debtors, none seems to have managed to use a CMO to discharge a debt.

The defendants were indicted for conspiracy to commit mail and bank fraud for their roles in FFP's foray into private banking. All of the defendants except Mark Van Dyke were also charged with specific counts of mail fraud in connection with sending or receiving correspondence pertaining to CMOs or CBCs. After a month-long jury trial of all the defendants, Thomas Stockheimer was convicted of conspiracy and 23 counts of mail fraud. He was sentenced to 15 years in prison. The jury convicted Leonard Peth of conspiracy and 22 counts of mail fraud. He received a prison sentence of 8 years and 1 month. Harry Days was acquitted of conspiracy, but he was convicted of two counts of mail fraud. Days was sentenced to 2 years and 4 months' imprisonment. Mark Van Dyke was convicted of conspiracy and received a prison sentence of 3 years, 10 months. A fifth defendant charged in the indictment, Thomas Ponchik, was tried along with the other defendants, but he was acquitted of the only count against him, conspiracy.

On appeal, all of the defendants challenge the adequacy of the government's evidence. They also assign error to the trial court's failure to instruct the jury that the defendants would be absolved if they had a good faith belief that they were acting within the law. Stockheimer and Peth appeal the court's denial of their motion to sever their cases from the other defendants. Stockheimer and Peth also appeal their sentences, on the grounds that the district court erred in determining the amount of the loss attributable to the fraud.

## I. Severance

Stockheimer and Peth argue that their trial should have been conducted separately from Ponchik's. Ponchik did not testify, but a postal inspector testified that Ponchik told him that there was "an inner circle of persons that were members of [FFP]" and that Ponchik "said that he was a part of this inner circle of five persons at the time." Tr. 1642–43. The postal inspector also testified that Ponchik described plans by FFP to establish satellite offices "to contain records of Family Farm Preservation and documents [so] that they could continue with the business of Family Farm Preservation in the event that another [government] search occurred at the offices in Tigerton." Tr. 1644. The defendants maintain that "Ponchik[']s [ ] reference to an 'inner circle' necessarily implies a criminal conspiracy by all the defendants on trial.... Moreover, Ponchik's alleged statements about the establishment of satellite offices to avoid the authorities necessarily implied that members of the inner circle had a conscious guilt about the CMO operation." Joint Reply Br. of Defs.–Appellants 9–10. (Evidently between the Defendants' principal brief and their reply brief, Van Dyke and Days adopted Stockheimer's and Peth's severance argument.) According to the defendants, under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the admission of Ponchik's statements violated their Sixth Amendment right "to be confronted with the witnesses against" them. We assume that the jury immediately concluded that (a) the other defendants—at least Stockheimer and Peth—belonged to the inner circle that Ponchik allegedly described, and (b) the other defendants participated in the plans for satellite offices. Nevertheless, Ponchik's statements do not "facially incriminate" these defendants. *United States v. Brooks*, 125 F.3d 484, 501 (7th Cir.1997). If Ponchik's statements incriminate the other defendants at all, they would only do so in conjunction with

other evidence introduced at the trial. Therefore the district court did not abuse its discretion by trying the defendants together. *See Gray v. Maryland,* —— U.S. ——, ——, 118 S.Ct. 1151, 1157, 140 L.Ed.2d 294 (1998); *see also Brooks,* 125 F.3d at 501–02.

■ The defendants also complain about another government witness's reference to an alias Peth used, "Pethahiah," but they make no attempt to explain why this particular reference was prejudicial, *see United States v. Lopez,* 6 F.3d 1281, 1285 (7th Cir. 1993), or even relevant. And in their reply brief, they complain about testimony that they did not mention in their principal brief. So they waived both these points, *see United States v. Cusimano,* 148 F.3d 824, 828 n. 2 (7th Cir.1998); *United States v. Bauer,* 129 F.3d 962, 969 (7th Cir.1997), which in any event concern statements that are not facially incriminating.

II. Sufficiency of the evidence

■ The defendants argue that their conduct did not constitute mail fraud because their claims about the utility of CMOs were so preposterous that no reasonable person would have acted on them. *Cf. United States v. Brown,* 79 F.3d 1550, 1557 (11th Cir.1996). (The defendants only make this argument with respect to the mail fraud statute, not bank fraud.) The argument is foreclosed by *United States v. Coffman,* 94 F.3d 330, 333–35 (7th Cir.1996). The defendants do not ask us to revisit *Coffman.* Instead, they suggest that *Coffman* was about jury instructions while their beef is with the sufficiency of the evidence. The defendants just misread *Coffman,* however. They base their argument on a passage in *Coffman* that apparently refers to jury instructions. *See id.* at 334 ("The ... purpose [of the 'reasonable person' language] .... is to guide the jury ....."). But only the sufficiency of the evidence—not jury instructions—was at stake and *Coffman*'s holding on that point is squarely against them: a scheme that a sophisticated person would recognize as incredible is not beyond the reach of the mail fraud statute. *See id.* at 334–35.

■ Harry Days also makes a separate argument that the government presented too little evidence. We only consider whether a rational jury could have found each of the elements of the crime were proven beyond a reasonable doubt. *See United States v. Peters,* 153 F.3d 445, 459–60 (7th Cir.1998). The elements of mail fraud are: (1) a scheme to defraud, (2) use of the mails to advance the fraud, and (3) the defendant's participation with intent to defraud. *See United States v. Carlino,* 143 F.3d 340, 343 (7th Cir.1998). Although Days does not explain which elements of the crime the government failed to prove, there is overwhelming evidence of a scheme to defraud and use of the mails. So we assume that Days is challenging intent.

The government introduced evidence of a CMO signed by Days, made out to a telephone company for $1,633. There is also a letter from the telephone company to FFP seeking to redeem the CMO and stating that the CMO was for the installation of a telephone system. And there is testimony from an FBI agent that Days told the agent of his previous unsuccessful attempts to use CMOs:

*Witness.* November of '93 he sent a CMO to pay off his mortgage and then January of '94 he learned that the bank did not get paid from the CMO and that it was worthless.

*Gov't.* And the word "worthless," is that your word or his word?

*Witness.* That's my word.

*Gov't.* What word did he use?

*Witness.* I don't recall the specific word, but something to the effect of there was no money behind the CMO.

Tr. 787. This evidence is enough to support a finding of intent to defraud.

■ Days also claims that there is no evidence that demonstrates that he was "the person who actually entered into the agreement with" the phone company. Br. of Defs.–Appellants 19. But there is evidence: it is just circumstantial evidence, which is perfectly competent. *See United States v. Taylor,* 116 F.3d 269, 271 (7th Cir.1997). Even if Days has identified a gap in the government's argument, it would be irrelevant. An intent to defraud does not turn on personal gain. *See United States v. Ross,* 77 F.3d 1525, 1543 (7th Cir.1996). It does not

matter whether Days entered into a contract with the phone company; all that matters is that he intended to inflict a loss. Maybe he did not, but his use of a CMO and his past experience with their use constituted sufficient evidence to permit the jury to conclude that he did. Days makes a similar argument with respect to the other count of which he was convicted. It fails on the same grounds.

III. Jury instructions

 Both bank fraud and mail fraud require an intent to defraud the victims. *See Carlino*, 143 F.3d at 343; *United States v. Moede*, 48 F.3d 238, 241 (7th Cir.1995). A perpetrator must act willfully. *See Moede*, 48 F.3d at 241; *United States v. Bailey*, 859 F.2d 1265, 1273–74 (7th Cir.1988); *United States v. Barber*, 881 F.2d 345, 348–49 (7th Cir.1989). The defendants contend that the trial court erred in refusing to instruct the jury that "[a] defendant does not act willfully if he believes in good faith that he is acting within the law or that his actions comply with the law" and that "[t]his is so even if the defendant's belief was not objectively reasonable as long as he held the belief in good faith." Appellant's Joint App. 15, at 1. The trial court did tell the jury that "a person who acts, or causes another person to act, on a belief or an opinion honestly held is not punishable under these statutes merely because that belief turns out to be inaccurate, wrong, or mistaken." Tr. 2785.

 But a defendant's belief in the legality of his conduct is not a defense to mail or bank fraud. *See United States v. Paradies*, 98 F.3d 1266, 1284–85 (11th Cir.1996); *United States v. Wicker*, 80 F.3d 263, 267 (8th Cir.1996); *United States v. Hilliard*, 31 F.3d 1509, 1517–18 (10th Cir.1994). A good faith misunderstanding of the Internal Revenue Code would be a defense if the defendants were accused of tax evasion, *see United States v. Hauert*, 40 F.3d 197, 202–03 (7th Cir.1994), but tax cases are " 'an exception to the traditional rule' that ignorance of the law is no excuse." *Bryan v. United States*, — U.S. —, —, 118 S.Ct. 1939, 1947, 141 L.Ed.2d 197 (1998) (quoting *Cheek v. United States*, 498 U.S. 192, 200, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991)).

The defendants assert that this case is comparable to a tax case because they "were

dealing with a complicated area of the law"— "what constitutes money rather than what money is properly reported as income and taxed." Joint Reply Br. of Defs.–Appellants 4. But neither mail fraud nor bank fraud "involve[ ] highly technical statutes that present[ ] the danger of ensnaring individuals engaged in apparently innocent conduct." *Bryan*, — U.S. at —–—, 118 S.Ct. at 1946–47. Nor are we persuaded that the legal nuances of "what constitutes money" are similar to the intricacies of the tax code. The defendants' claim that the complexities are comparable is not backed up by any argument or analysis. At trial the defendants did testify that they sincerely believed that CMOs were legitimate because " 'the right of banking in all [of its] ramifications belonged to individual citizens and might be exercised by them at [their] pleasure,' " *First State Bank of Holstein v. Shallenberger*, 172 F. 999, 1001 (C.C.D.Neb.1909) (quoting *Bank of Augusta v. Earle*, 38 U.S. (13 Pet.) 519, 10 L.Ed. 274 (1839)), *rev'd*, 219 U.S. 114, 31 S.Ct. 189, 55 L.Ed. 117 (1911). But none of this evidence was offered for the truth of the proposition that the defendants were really grappling with legal issues as Byzantine as those presented by the tax code. *See, e.g.*, Tr. 2326.

Criminal tax cases, however, are not the only ones in which the term "willfully" can indicate that a violator must know that his conduct is unlawful. *Compare Bryan*, — U.S. at —, 118 S.Ct. at 1946, *with United States v. Obiechie*, 38 F.3d 309, 315–16 (7th Cir.1994) (dealing in firearms without a federal license). The term "willfully" also has been interpreted as a requirement that a defendant know that he is doing something illegal where the text of the statute uses both the terms "knowingly" and "willfully." The joint use of the terms may demonstrate that " 'willfully' must mean something more than 'knowingly.' " *Obiechie*, 38 F.3d at 315.

The bank fraud statute (but not the mail fraud statute) underlying three of the defendants' conspiracy convictions expressly requires that a defendant *"knowingly* execute[ ], or attempt[ ] to execute" a fraudulent scheme. 18 U.S.C. § 1344 (emphasis added). Also, our *case law* says that bank fraud

requires a willful act. *See Moede*, 48 F.3d at 241. If bank fraud requires a defendant to act both knowingly and willfully, *see United States v. Brandon*, 17 F.3d 409, 425 (1st Cir.1994), *and if* those terms must mean different things, bank fraud might well require knowledge that the conduct is *unlawful*. We reject this analysis, however, because we have found no indication that the introduction of the willfulness requirement into the bank fraud *case law* has any independent significance beyond the knowledge requirement in the express language of the statute. For it appears that the willfulness requirement in bank fraud cases was derived from the mail fraud *case law*. *Compare United States v. Sims*, 895 F.2d 326, 328 (7th Cir.1990), *with Bailey*, 859 F.2d at 1276–77. Since there is no express requirement of knowledge in the text of the mail fraud *statute*, willfulness in that context simply means knowing and purposeful conduct. Therefore, while a more expansive interpretation of the term "willfully" may be appropriate when Congress includes both the words "willfully" and "knowingly" in the *text of the statute*, such a method of interpretation is not reliable in this situation, where "willfully" has been supplied by the courts instead of appearing in the text of the bank fraud statute. *See United States v. Brown,* 31 F.3d 484, 489 & n. 5 (7th Cir.1994).

IV. Sentencing—intended loss

Under the sentencing guidelines, the base offense level for a crime of fraud is six. The level is increased by up to 18 levels depending on the amount of the loss attributable to the fraud. *See* USSG § 2F1.1(b)(1); *United States v. Bonanno*, 146 F.3d 502, 509 (7th Cir.1998). The maximum increase of 18 levels applies when the loss exceeds $80 million. "[I]f an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." USSG § 2F1.1 cmt. n. 7. The district court found that Stockheimer and Peth intended to inflict a loss of over $80 million, and sentenced each of them based on the maximum level of loss. It is clear that the actual loss did not come close to this magnitude.

The government calculated the intended losses from FFP's records of the face value of the CMOs presented to creditors and then sent by creditors to FFP for redemption. By the time the government had reviewed FFP's files for individuals with surnames from *A* through *H*, the total face value of the CMOs was over $180 million. Because this amount was above the top of the guidelines' loss scale, the government stopped its alphabetical examination at the letter *H*.

Stockheimer and Peth dispute the district court's determination of loss on the grounds that a loss of over $80 million was not a realistic possibility. Some circuits have taken the position that an intended loss is not the appropriate criterion in cases "in which the total intended loss bore no relation to 'economic reality' … because … the plan had no chance of success." *United States v. Fleming*, 128 F.3d 285, 288 (6th Cir.1997). *See generally* Frank O. Bowman, III, *Coping with "Loss": A Re-examination of Sentencing Federal Economic Crimes Under the Guidelines*, 51 Vand. L.Rev. 461, 564–65 (1998); John D. Cline, *Should the Sentencing Commission Adopt the Economic Reality Doctrine?*, 10 Fed. Sentencing Rep. 141 (Nov./Dec.1997). We have indicated, however, that the time to take economic reality into account "is [at] a district court's downward departure decision." *United States v. Downs*, 123 F.3d 637, 644 (7th Cir.1997); *see also Bonanno*, 146 F.3d at 509–10; *United States v. Coffman*, 94 F.3d 330, 336–37 (7th Cir.1996); *United States v. Studevent*, 116 F.3d 1559, 1562–63 (D.C.Cir.1997).

It is true that our cases rejecting the economic reality principle are distinguishable. They involve schemes that were discovered and interrupted before they ran their course. In such cases, the intended loss is a reflection of "the amount that the defendant placed at risk" but for the interruption. *See United States v. Lauer*, 148 F.3d 766, 767 (7th Cir.1998). In the present case, although the government ultimately shut down the defendants' home banking operation, there is nothing in the record to suggest that this significantly reduced the losses inflicted upon creditors by debtors' attempts to negotiate the CMOs. The defendants apparently took in a tidy sum from donations received in exchange for blank

CMOs (perhaps $200,000), but even if the scheme had not been terminated, donations would never have approached $80 million. The Fifth Circuit recently signed off on an intended loss of $61 million in a case involving a Texas version of FFP's CMO scheme. *See United States v. Moser*, 123 F.3d 813, 830 (5th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 642, 139 L.Ed.2d 620 (1997), —— U.S. ——, 118 S.Ct. 884, 139 L.Ed.2d 872 (1998). In *Moser* the intended loss was also determined from the face value of the CMOs involved. The $61 million defendant did not make an economic reality argument, however. (Or if he did, the opinion does not address it.)

In the present case, the record does not establish that the defendants' scheme placed over $80 million at risk. There may have been a significant possibility that some CMOs would trigger actual losses. An actual loss could occur short of a creditor's discharging a debt, if a creditor "release[d] security, delay[ed] efforts at collection or otherwise act[ed] in reliance upon" a CMO or CBC. *United States v. Jacobs*, 117 F.3d 82, 93 (2d Cir.1997). In fact, the defendants concede that some *creditors* incurred losses. Br. of Defs.–Appellants 12. The existence of a significant possibility that lightning might strike, however, does not mean that there is a significant risk of thousands of lightning strikes over the same period. An $80 million loss was not impossible. But if that were enough to show that $80 million were at risk, the defendants also could have put $80 million at risk by sending a forged court order to the National Park Service directing the Service to relocate the Statue of Liberty to Tigerton. After all, it is not inconceivable that the Park Service could be induced to at least ship a few parts of the structure to Tigerton based on some pretext.

The fact that the present case is not on all fours with our earlier intended loss cases, however, does not imply that the economic reality doctrine is applicable here. Our characterization of the intended loss as the amount at risk remains useful for a wide range of cases. But the guidelines § 2F1.1, and the relevant accompanying commentary, *see Stinson v. United States*, 508 U.S. 36, 38, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993), do not refer to the amount at risk or the "possi-

ble" loss. (At one time the commentary did include a reference to "probable" loss. *See Studevent*, 116 F.3d at 1562 n. 1; *Bowman, supra*, at 564 & n. 422.) The operative concept in determining the offense level is simply the "intended loss." The only hint of the relevance of economic reality in the text of the guidelines and commentary is in the provision allowing a *downward departure* for transparently bogus schemes. We need not decide whether an intended loss that depended on circumstances "contrary to the laws of nature," *United States v. Scott*, 145 F.3d 878, 883 (7th Cir.1998), would be a suitable basis for determining the offense level for a crime of fraud. (The question whether a scheme is literally impossible could be a tricky one, since it requires identifying its essential elements and analyzing whether it could have succeeded by employing a different set of inessential elements.) In this case the defendants admit that an $80 million loss was not impossible. In some circumstances, the extreme improbability of a loss might undermine a finding of intent. But the defendants do not challenge the findings of intent here, and a review of the trial and sentencing transcripts confirms that those findings were not plain error, or even clear error. So we find no error in the district court's calculation of the level of the offense.

Our review of Stockheimer's sentencing transcript, however, reveals that the district court misunderstood the legal principles applicable to Stockheimer's motion for a downward departure. The district court quoted extensively from *Coffman*, 94 F.3d at 336, to explain its refusal to depart downward. The language the court quoted, however, is a discussion of the inappropriateness of applying an economic reality test to a determination of the offense level—*prior* to consideration of any departure. The court read language explaining why probable loss should not be taken into account *until* consideration of a downward departure motion as a rationale for not taking probable loss into account in *considering* a downward departure. *See* Stockheimer Sent. Tr. 3436. For example, the court viewed the following passage from *Coffman* as indicating that Stockheimer's case did not warrant a downward departure: "We know that frauds that have no chance of succeeding are neverthe-

less punishable, and it would be extremely odd, as well as contrary to the language of the guidelines, to treat all such frauds the same, as frauds involving an intended loss of zero, even if the magnitude of the intended loss differed vastly." 94 F.3d at 337; *see also* Stockheimer Sent. Tr. 35–36. Immediately after quoting this language, the court stated, "It does, based upon the holding there, seem to indicate that it's not on the basis of this factual situation warranted, and the court will deny the downward departure that has been suggested by the defendant." *Id.* at 36. The language the court quoted from *Coffman* does not provide a legal basis for evaluating a downward departure. This is demonstrated by the sentence in *Coffman* that comes right before the one quoted by the court: "[Y]et it seems plain to us that the place for mitigation on the basis of a large discrepancy between intended and probable loss is, under the guidelines, in the decision whether to depart downward, rather than in the calculation of the intended loss." 94 F.3d at 336–37. The sentence relied on by the court thus deals with the calculation of intended loss, not with downward departure.

■ Conceivably—although the record does not show this—the district court might have decided that the language it quoted was not only a good justification for rejecting the economic reality doctrine, but also explained why it would not depart downward. That would also be legal error which would give this court jurisdiction to review the refusal to depart downward. *See United States v. Wallace*, 114 F.3d 652, 655–56 (7th Cir.1997). A district court enjoys wide discretion to refuse a motion to depart downwards, even without explanation, *see United States v. Schaefer*, 107 F.3d 1280, 1287 (7th Cir.1997), *cert. denied,* —— U.S. ——, 118 S. Ct. 701, 139 L.Ed.2d 645 (1998), but if it indicates that it is relying on an irrelevant principle—for example, "because this is Tuesday, on these facts a downward departure is not warranted"—there is a risk that the sentence is imposed in violation of the law. *Cf. United States v. Burnett*, 66 F.3d 137, 139 (7th Cir. 1995); *United States v. Campo*, 140 F.3d 415, 418–19 (2d Cir.1998) (per curiam).

■ Although in the trial court Stockheimer and Peth argued that they deserved downward departures, on appeal they do not mention the denial of their motions. We may consider the matters anyway, but under these circumstances our power to correct an error depends on whether it was plain. *See Johnson v. United States,* 520 U.S. 461, 117 S.Ct. 1544, 1548–49, 137 L.Ed.2d 718 (1997); *United States v. Jackson,* 32 F.3d 1101, 1104 (7th Cir.1994); *id.* at 1112 (Posner, C.J., concurring); *id.* (Kanne, J., concurring in part and concurring in the judgment); *United States v. Seacott,* 15 F.3d 1380, 1383–84 (7th Cir.1994); *United States v. Belanger,* 936 F.2d 916, 920 (7th Cir.1991). *Schaefer,* 107 F.3d at 1283–88, illustrates that we do not blithely recognize plain error in a sentencing court's decision not to depart downward. The record must show that the district court has both a substantive basis and an inclination to consider a downward departure. *Id.* at 1286–88.

■ In Stockheimer's case there may be a persuasive basis for the district court to consider a downward departure on the basis of the variance between the intended loss and the realistic possibility of such a loss. An $80 million loss may seriously overstate the seriousness of his offense. As for the receptiveness of the district court to the granting of a downward departure, Stockheimer's sentencing transcript does not contain a direct statement that the district court would grant a downward departure if it believed it possessed the authority to do so. That cannot be dispositive, however. If the court believed it lacked the authority to depart, it lacked a strong incentive to consider precisely what it would do if it did have the authority to depart. But the court said enough to take our review well out of the realm of speculation: "Well, the first thing I want to comment on is that when I read that footnote initially to which defense counsel has referred it did sound to me like it was somewhat tailor made for this type of factual situation *where it overstates the seriousness of the offense* as the loss was determined in this particular sentencing, *where it's so obvious, that the CMO is so fraudulent that no one would consider honoring it.*" Stockheimer Tr. 34 (emphasis added). But the court then went on to explain why under its (erroneous) understanding of *Coffman*—its

reading of a discussion about the calculation of the intended loss as pertaining to the propriety of departing downward—a downward departure was inappropriate.

The district court's error was plain because there is no question that *Coffman* provides no basis for denying a downward departure. *See United States v. Thomas*, 150 F.3d 743, 745 (7th Cir.1998) (per curiam). Our confidence in our conclusion about the proper calculation of the amount of the intended loss is based in significant part upon this understanding of *Coffman*. Since the record suggests that the district court had a legal basis and some predilection to depart downward, the error affected Stockheimer's substantial rights. *See United States v. Otis*, 107 F.3d 487, 489 (7th Cir.1997). Finally, because of the apparently unprecedented magnitude of the discrepancy between the actual and intended loss, we conclude that the error seriously affected the fairness of Stockheimer's sentencing proceedings. *See United States v. Wilson*, 134 F.3d 855, 863 (7th Cir.1998), *petition for cert. filed* (U.S. July 13, 1998) (No. 98–5243). At oral argument, not even the government was willing to say that $80 million was a fair estimate of the seriousness of FFP's conspiracy. We therefore have discretion to vacate Stockheimer's sentence and remand for resentencing. *See Johnson*, 117 S.Ct. at 1548–49; *Seacott*, 15 F.3d at 1386.

■ Peth was sentenced three days after Stockheimer. At Peth's hearing, the district court stated, "I don't believe after a five-week trial that I could truthfully and honestly hold that the guideline range overstates the seriousness of the offense." Peth Sent. Tr. 30. This statement is difficult to reconcile with the court's statements at Stockheimer's sentencing, except that in Peth's case the sentencing guidelines yield a much lower sentence. We might speculate the district court remained under the misapprehension of the guidelines exposed at Stockheimer's sentencing. We think the proper procedure, however, is to recognize that the defendants' sentencing proceedings were independent. The record of Peth's sentencing reflects no error, plain or otherwise, in the district court's consideration of Peth's downward departure motion. There is therefore no basis for this court to exercise jurisdic-

tion over the denial of the motion. *See United States v. Saunders*, 129 F.3d 925, 933 (7th Cir.1997).

But Stockheimer's case was no longer before the district court at the time of Peth's sentencing, and we will therefore make no assumptions about Stockheimer's case on the basis of the district court's remarks about Peth's. We remand Stockheimer's case for re-sentencing, on the grounds of plain error. *See United States v. Szabo*, 147 F.3d 559, 561 (7th Cir.1998). Although this disposition must and does reflect a strong conviction that on the basis of the record, consideration of a downward departure is appropriate, the actual decision is entirely in the hands of the district court. We recognize that there are critical variables bearing on the district court's ultimate decision that may not be apparent in the record before us, and nothing in this opinion is intended to encourage the district court to decide the matter one way or the other. Of course, a decision on remand not to grant a motion for downward departure would not be reviewable by this court in any event, with very limited exceptions. *See United States v. Madoch*, 149 F.3d 596, 602 (7th Cir.1998).

The judgments of conviction and Peth's sentence are AFFIRMED. Stockheimer's sentence is VACATED and REMANDED for re-sentencing not inconsistent with this opinion.