UNITED STATES of America,
Plaintiff,

v.

Marquis ROEN, Defendant.

No. 03–CR–63.

United States District Court,
E.D. Wisconsin.

Aug. 25, 2003.

Mario F. Gonzales, for Plaintiff or Petitioner.

Brian P. Mullins, for Defendant or Respondent.

## MEMORANDUM

ADELMAN, District Judge.

### I. FACTS AND BACKGROUND

Defendant Marquis Roen was charged with five counts of mail fraud based on a scheme he devised to defraud Northwestern Mutual Life ("NML") and dozens of vendors and merchants by writing checks on closed bank accounts. Defendant had a life insurance policy with NML valued at $9747.26. He induced NML to issue him loans against the policy, which he "repaid" with checks drawn on closed accounts at Northern Trust Bank ("NTB") and North Shore Bank ("NSB"). Counts one through four were based on checks NML sent defendant through the United States mail. Defendant's scheme cost NML $19,254.82, the amount it loaned him less the value of the life insurance policy.

Defendant opened the account at NTB by promising that he would wire $600,000

from a non-existent Swiss bank account. NTB then gave him a box of pre-printed checks. Defendant never wired the money, so NTB closed the account and attempted to get the checks back. However, defendant refused to cooperate and instead proceeded to write checks in the amount of $1.2 million on the account as payment for various high priced items. None were honored, and defendant failed to obtain any goods through the use of these checks. (Defendant sent a check in the amount of $48,995.00 drawn on the NTB account to a vendor called Fine Art Models as payment for five model ships he had ordered via telephone. Fine Art Models discovered the check was bad and never sent the merchandise. This incident formed the basis for the fifth count of the indictment.)

Following defendant's pleas of guilty to all five counts, the probation office prepared a pre-sentence report (PSR). The PSR recommended a base offense level of 6 under U.S.S.G. § 2B1.1(a) and a 16 level enhancement for "amount of loss" under § 2B1.1(b)(1). According to the PSR, the appropriate loss amount was $1,268,-249.82—the sum of the "actual loss" to NML, plus the "intended loss" based on the checks written on the NTB account and the check sent to Fine Art Models.

Defendant objected to the loss determination, arguing that he never intended to cause any loss with the NTB checks. Alternatively, he argued that if the court adopted the PSR's loss determination it should depart downward because the resulting offense level substantially overstated the seriousness of his offense.

I adopted the PSR's loss determination but granted the downward departure. In this memorandum I explain my reasoning.

## II. LOSS DETERMINATION

### A. Operation of § 2B1.1

Section 2B1.1 of the sentencing guidelines governs offenses involving fraud or deceit, such as those at issue here. The base offense level under the guideline is only 6. U.S.S.G. § 2B1.1(a). However, § 2B1.1(b)(1) provides incremental offense level enhancements based on the amount of monetary "loss" caused by the defendant's scheme. The greater the loss, the greater the enhancement. This reflects the Sentencing Commission's view that "loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under this guideline." U.S.S.G. § 2B1.1 cmt. background.

There appear to be two principles behind the Commission's conclusion that loss should dictate the severity of the sentence in fraud cases: (1) loss measures the amount of (actual) harm caused by the defendant, and (2) it "serves as a gauge of the defendant's guilty mind." Roger W. Haines, Jr. et al., *Federal Sentencing Guidelines Handbook* 275 (2002).

[S]tealing more is worse than stealing less and merits greater punishment, not only because a larger loss inflicts a greater harm, but also because one who *desires* to inflict a large harm is customarily thought to have a more reprehensible condition of mind than one who desires to inflict a small one. To this extent, actual loss is not a bad proxy for mental state. (And, of course, intended loss is a direct measurement of culpable mental state.).

*Id.*

In others words, we ordinarily should punish the defendant not just for the harm he *actually* caused but also for the harm he *wanted* to cause (but for whatever reason was unable to). This, in turn, reflects the determination that those with more reprehensible mental states should receive more severe punishment, and that those who create a greater risk of harm to soci-

ety should receive greater punishment. The criminal should not ordinarily evade punishment because fate (or the police) intervened.

In keeping with this philosophy, the Commission has instructed that under § 2B1.1(b)(1) "loss" should be considered the greater of the actual loss or the intended loss. U.S.S.G. § 2B1.1 cmt. n. 2(A). "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n. 2(A)(i). "Intended loss" is defined as the pecuniary harm that was intended to result from the offense, and includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value). U.S.S.G. § 2B1.1 cmt. n. 2(A)(ii).

## B. Defendant's Objection to the PSR's Loss Determination

Defendant acknowledged that § 2B1.1 allows the use of "intended loss" when it is greater than the "actual loss." However, he argued that the government could not establish [1] that he intended to cause loss based on the NTB checks because he knew the checks would not be honored and knew the potential victims of his scheme would learn the checks were bad before they completed any sales. He asserted that he never intended to take possession of any of the items he attempted to purchase; rath-

er, the "thrill of the sale" motivated him to engage in transactions he knew were futile. Therefore, he argued, the appropriate loss amount was the $19,000 actual loss suffered by NML.

In *United States v. Stockheimer*, 157 F.3d 1082 (7th Cir.1998), the court rejected a similar argument. There, the defendants argued that the $80 million "intended loss" used by the district court was improper because the scheme had no chance for success due to the transparently bogus nature of the instruments defendants produced.[2] Thus, the defendants argued, the loss bore no relation to "economic reality." However, the court held that the time to take "economic reality" into account was in the consideration of a downward departure, not in setting the amount of loss. *Id.* at 1089. The court stated:

The operative concept in determining the offense level is simply the "intended loss." The only hint of the relevance of economic reality in the text of the guidelines and commentary is in the provision allowing a downward departure for transparently bogus schemes. We need not decide whether an intended loss that depended on circumstances "contrary to the laws of nature," *United States v. Scott*, 145 F.3d 878, 883 (7th Cir.1998), would be a suitable basis for determining the offense level for a crime of fraud. (The question whether a scheme is liter-

---

1. The government bears the burden of proving the amount of loss by a preponderance of the evidence. *See United States v. Higgins*, 270 F.3d 1070, 1075–76 (7th Cir.2001); *United States v. Vivit*, 214 F.3d 908, 916 (7th Cir.2000).

2. In *Stockheimer*, the defendants came up with a scheme whereby they sold "certified money orders" for "donations" of $500. The defendants advised their customers that they could legally discharge a debt by sending a creditor a certified money order filled out for

the amount owed. The money order indicated that it could be redeemed by sending it to the defendants' post office box in Wisconsin. If a creditor returned the money order, the defendants would send the creditor a "certified banker's check." If the creditor continued to play along and returned the certified banker's check to the defendants, it would be returned stamped "paid in full." As far as the defendants were concerned, that was the end of the transaction. Of course, the creditor received no money. *Id.* at 1085

ally impossible could be a tricky one, since it requires identifying its essential elements and analyzing whether it could have succeeded by employing a different set of inessential elements.) In this case the defendants admit that an $ 80 million loss was not impossible.

*Id.* at 1090; *see also United States v. Coffman,* 94 F.3d 330, 336 (7th Cir.1996) (rejecting argument that a loss that cannot occur cannot be intended); U.S.S.G. § 2B1.1 cmt. n. 2(A)(ii) (stating that intended loss includes loss "that would have been impossible or unlikely to occur").

Defendant conceded that *Stockheimer* cut against his argument. However, he pointed to the court's statement that, in "some circumstances, the extreme improbability of a loss might undermine a finding of intent." *Stockheimer,* 157 F.3d at 1090. He contended that the improbability of his scheme supported his claim that he never intended to cause a loss with the NTB checks.

■ However, the facts did not support his contention. Defendant submitted orders for these products, in person, by phone and by mail. He then sent checks for the purchase price. This revealed an intent to obtain goods. Further, it is not improbable that a vendor would send merchandise without waiting for a check to clear or otherwise investigating its customer. Although it appears that the vendors did not do so in this case, I could not conclude that a loss was so improbable that defendant could not have intended one. I found that defendant's actions revealed an intent to cause a loss, even though he may not have expected many or even most of his victims to fall for his scheme. I could not accept his argument that he was motivated only by the "thrill of the sale." His conduct with NML re-

vealed that defendant devised this scheme in order to obtain money or things of value, not just to enhance his view of himself. Therefore, I found that he intended to cause a loss with the NTB checks. *See United States v. Strozier,* 981 F.2d 281, 284–85 (7th Cir.1992) (rejecting argument that defendant fraudulently opened account in large amount because he "had a grandiose view of himself and wanted large numbers in those accounts," rather than with intent to cause loss).

Defendant did not dispute the figures presented by the government; he conceded that he wrote checks in the amount alleged. Therefore, I found by a preponderance of the evidence that the amount of loss was $1,268,249.82 and that the 16 level increase recommended by the PSR was appropriate.[3]

### III. DOWNWARD DEPARTURE

Defendant next argued that if the court agreed with the PSR on the loss issue it should depart downward because the resulting offense level substantially overstated the seriousness of the offense.

### A. General Departure Principles

The court may depart from the applicable guideline range if the court "finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" U.S.S.G. § 5K2.0(a) (quoting 18 U.S.C. § 3553(b)). The Commission has provided guidance in making departure decisions by listing certain factors that are "forbidden" bases for departure, "encouraged" bases for departure, and "discouraged" bases for depar-

---

**3.** The Seventh Circuit has approved computing the total loss as the sum of the actual loss to one victim and the intended loss to other victims, as the PSR did in this case. *See United States v. Lauer,* 148 F.3d 766, 767 (7th Cir.1998).

ture. *Koon v. United States*, 518 U.S. 81, 93–95, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

The Supreme Court has thus adopted the following test for determining whether to depart: (1) What factors of the case make it special or unusual? (2) Has the Commission forbidden departures based on those factors? (3) If not, has the Commission encouraged departures based on those factors? (4) If not, has the Commission discouraged departures based on those factors? *Id.* at 95, 116 S.Ct. 2035.

> If the special factor is a forbidden factor, the sentencing court cannot use it as a basis for departure. If the special factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account. If the special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. If a factor is unmentioned in the Guidelines, the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether it is sufficient to take the case out of the Guideline's heartland.

*Id.* at 95–96, 116 S.Ct. 2035 (internal citations and quote marks omitted).

## B. Departures Based on Loss Amount

Application note 15(B) to § 2B1.1 provides: "There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." Although the note does not specifically refer to the *amount of loss* overstating the seriousness of the offense as did analogous provisions of the former fraud guideline, *see* U.S.S.G. § 2F1.1 cmt. n. 8(b) & 11 (2000),[4] the change was "one of style rather than substance," Haines et al., *supra*, at 325. Because the loss determination essentially dictates the severity of the sentence, it is this determination that will almost always be the subject of departure scrutiny.

█  Therefore, in cases in which the loss determination results in an offense level that substantially overstates the severity of the offense, the court may depart. This is, in *Koon*'s nomenclature, "an encouraged basis for departure." *United States v. Corry*, 206 F.3d 748, 751 (7th Cir.2000); *see also United States v. Lane*, 194 F.Supp.2d 758, 775 (N.D.Ill.2002).

There are four basic situations in which a departure on this basis may be appropriate. *United States v. Forchette*, 220 F.Supp.2d 914, 924–25 (E.D.Wis.2002). The first is the "multiple causation" scenario, in which the amount of loss is determined to be the product of several sources (e.g., an economic downturn, a market collapse, or negligence by the victims), in addition to the defendant's conduct. *Id.* at 924 (citing *United States v. Rostoff*, 53 F.3d 398, 406–08 (1st Cir.1995); *United States v. Morris*, 80 F.3d 1151, 1172–74 (7th Cir.1996); *United States v. Miller*, 962 F.2d 739, 744 (7th Cir.1992); *United States v. Kopp*, 951 F.2d 521, 531 (3d Cir.

---

**4.** Former note 8(b) stated, in pertinent part: "Where the loss determined above significantly understates or overstates the seriousness of the defendant's conduct, an upward or downward departure may be warranted." Note 11(b) stated, in pertinent part: "In a few instances, the loss determined under subsection (b)(1) may overstate the seriousness of the offense. This may occur, for example, where a defendant attempted to negotiate an instrument that was so obviously fraudulent that no one would seriously consider honoring it. In such cases, a downward departure may be warranted."

1991); *United States v. Carey,* 895 F.2d 318, 322 (7th Cir.1990)).

The second scenario, logically related to the first, is when the defendant plays a limited or inferior role in the scheme that bore little relationship to the amount of loss determined under the guideline. *Id.* at 925 (citing *United States v. Brennick,* 134 F.3d 10, 13 (1st Cir.1998); *Morris,* 80 F.3d at 1172–74; *United States v. Broderson,* 67 F.3d 452, 459 (2d Cir.1995); *United States v. Monaco,* 23 F.3d 793, 799 (3d Cir.1994); *United States v. Stuart,* 22 F.3d 76, 82 (3d Cir.1994); *United States v. Nachamie,* 121 F.Supp.2d 285, 295–97 (S.D.N.Y.2000), *aff'd,* 5 Fed. Appx. 95 (2d Cir.2001); *United States v. Costello,* 16 F.Supp.2d 36, 39–40 (D.Mass.1998); *United States v. Jackson,* 798 F.Supp. 556, 557 (D.Minn.1992)).

The third situation occurs when the defendant's effort to remedy the wrong merits consideration, as, for example, where he makes extraordinary restitution or, in a fraudulent loan case, where he had sufficient unpledged assets to cover the loss. *Id.* (citing *United States v. Oligmueller,* 198 F.3d 669, 671–72 (8th Cir.1999); *United States v. Bean,* 18 F.3d 1367, 1369 (7th Cir.1994); *Carey,* 895 F.2d at 323).

The first three scenarios will typically occur when the court is sentencing based on actual loss. The fourth arises when the court adopts a figure based largely or solely on intended loss. A departure in this situation is based on the so-called "economic reality" principle. In some cases, as where a defendant devises an ambitious scheme obviously doomed to fail and which causes little or no actual loss, it may be unfair to sentence the defendant based on the intended (but highly improbable) loss determination from the § 2B1.1 table; the intended loss bears no relation to "economic reality." *Id.* at 924–25; *see also Stockheimer,* 157 F.3d at 1089 (stating that the court should evaluate the "economic reali-

ty" of a scheme in considering a downward departure); *Coffman,* 94 F.3d at 336–37 (stating that "the place for mitigation on the basis of a large discrepancy between intended and probable loss is, under the guidelines, in the decision whether to depart downward").

In *Stockheimer,* the court suggested that two factors are relevant in considering a downward departure motion on this basis. The first is whether there was any reasonable possibility that the scheme could have caused the loss the defendant intended. This analysis is consistent with the Commission's theory of punishment in fraud cases. Those who devise ridiculous schemes (1) do not ordinarily have the same mental state and (2) do not create the same risk of harm as those who devise cunning schemes. In short, they are not as dangerous. Thus, it is entirely proper to mitigate their sentences by a departure.

The second factor is whether the intended loss is grossly disproportionate to any actual loss. Of course, the best evidence of a scheme's probable success is its actual success. In *Stockheimer,* for example, the intended loss was determined to be $80 million, yet the defendants' take was perhaps $200,000. The court found that this evidence provided a "persuasive basis for the district court to consider a downward departure on the basis of the variance between the intended loss and the realistic possibility of such a loss. An $80 million loss may seriously overstate the seriousness of [the] offense." 157 F.3d at 1091.

## C. Defendant's Scheme and Economic Reality

█ I concluded that on the facts of this case a loss of over $1.2 million substantially overstated the seriousness of defendant's offense. First, the NTB account was closed within days of being opened;

none of the checks defendant wrote on the account were honored; and none of the recipients of those checks provided defendant with goods or services in exchange. Although defendant's scheme was not so improbable as to defeat a finding of intent, it was such that the amount of loss bore little or no relation to economic reality. *See id.* at 1089. As in *Stockheimer,* there was no reasonable possibility that this scheme would have caused over a million dollars in losses.

Second, the discrepancy between the actual loss—$19,000—and the intended loss—over $1.2 million—was extreme. The *Stockheimer* court held that given the gross disparity between the figures in that case the district court's erroneous conclusion that it could not depart seriously affected the fairness of the defendant's sentencing. *Id.* at 1092. Refusal to depart in the present case would have similarly affected the fairness of defendant's sentence. Finally, as in *Stockheimer,* the government did not argue that the amount of intended loss fairly reflected the seriousness of the scheme.

For all of these reasons, I concluded that a downward departure should be granted under U.S.S.G. § 2B1.1 cmt. n. 15(B). Once a court decides to depart the extent of the departure is a matter within the court's discretion and will be upheld so long as it is reasonable and adequately reflects the structure of the guidelines. *United States v. Cruz–Guevara,* 209 F.3d 644, 647 (7th Cir.2000); *see also* 18 U.S.C. § 3742(e)(3)(C). While there are no hard and fast rules to govern the extent of a

departure, the Seventh Circuit has approved a method that involves calculating the defendant's sentence by analogy to existing guideline provisions. *Cruz–Guevara,* 209 F.3d at 648.

In the present case, I concluded that a nine level departure was appropriate. This departure largely, although not completely, discounted the dramatic increase in offense level based on intended loss.[5] It was not appropriate to treat this as a $1.2 million fraud case when defendant's take was only $19,000 and no other victims were seriously placed at risk. However, I could not entirely ignore the scores of bad checks defendant wrote, including the one to Fine Art Models which formed the basis for count 5. The nine level departure provides some increased punishment for this conduct.

## IV. CONCLUSION

**THEREFORE,** for the reasons stated, defendant's objection to the PSR was **OVERRULED,** and defendant's motion for a downward departure was **GRANTED.**

---

**5.** According to the PSR, defendant's total offense level was 19: base level 6 + 16 for amount of loss—3 for acceptance of responsibility under § 3E1.1. With the departure, defendant was treated as if the loss enhance-ment was 6 levels: base level 6 + 6 for amount of loss—2 for acceptance of responsibility (there is no third point deduction for acceptance when the level is below 16).