**UNITED STATES of America,
Plaintiff,**

v.

**Marquis ROEN, Defendant.**

**No. 03–CR–63.**

United States District Court,
E.D. Wisconsin.

Feb. 25, 2005.

Mario Gonzales, Milwaukee, WI, for Plaintiff.

Brian Mullins, Milwaukee, WI, for Defendant.

### SENTENCING MEMORANDUM

ADELMAN, District Judge.

In *United States v. Booker,* —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), the Supreme Court held that the federal sentencing guidelines violated the Sixth Amendment. As a remedy, the Court excised the provision of the Sentencing Reform Act that made the guidelines mandatory, 18 U.S.C. § 3553(b), and the provision that required the courts of appeals to enforce the guidelines, 18 U.S.C. § 3742(e). With these excisions, the Court made the guidelines "effectively advisory." *Booker,* 125 S.Ct. at 757. Additionally, the

Court directed appellate courts to hence-forth review sentences for "unreasonableness." *Id.* at 765.

Although *Booker* imposes new responsibilities, a body of law exists to which courts can look for guidance. District courts imposing sentences following revocation of probation or supervised release have long used advisory guidelines, *see* U.S.S.G. ch. 7, pt. A, and appellate courts have reviewed such sentences to determine whether they were "plainly unreasonable," *e.g., United States v. Kelley,* 359 F.3d 1302, 1304 (10th Cir.2004); *United States v. Marvin,* 135 F.3d 1129, 1143 (7th Cir. 1998). *See United States v. Crosby,* 397 F.3d 103, 115 (2d Cir.2005) (noting the parallel between sentencing after revocation and sentencing post-*Booker*).

### I. PRINCIPLES OF SENTENCING AFTER REVOCATION

▪ Before *Booker,* district courts sentenced defendants in revocation cases as, I believe, they now should in all cases. *See United States v. Ranum,* 353 F.Supp.2d 984, 984–87 (E.D.Wis.2005) (setting forth sentencing methodology after *Booker*). This is so because in revocation cases the Sentencing Commission promulgated advisory "policy statements" rather than mandatory guidelines. U.S.S.G. ch. 7, pt. A. Thus, in a revocation case, while a district court has to "consider" the guideline range, it is "thereafter free to impose a sentence outside the designated range, subject to the maximum sentence allowable under 18 U.S.C. § 3583(e)(3)," the statute governing revocation of supervised release. *United States v. Hale,* 107 F.3d 526, 529 (7th Cir.1997).

▪ In sentencing defendants after revocation, courts have considered the factors set forth in 18 U.S.C. § 3553(a), as they now should in all cases. These factors include:

(1) the nature and circumstances of the offense, and the history and characteristics of the defendant;

(2) the need for the sentence imposed to -

    (a) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (b) to afford adequate deterrence to criminal conduct;

    (c) to protect the public from further crimes of the defendant; and

    (d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the applicable range set by the guidelines;

(5) any pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a); *see also Hale,* 107 F.3d at 530 ("Section 3583(e)(3) provides that in revoking a term of supervised release and imposing a prison sentence, the court should consider certain of the factors set forth in section 3553(a), including the nature of the offense and of the defendant's history and characteristics, the need to afford adequate deterrence and protection to the public, applicable policy statements in the Sentencing Guidelines, and the need to avoid unwarranted sentencing disparities among similarly situated defendants.") Although § 3553(a) directs that courts "shall" consider the above factors, courts need not make specific findings as to each one but rather must make "comments reflecting that the appropriate factors were considered." *Hale,* 107 F.3d at 530; *see also Kelley,* 359 F.3d at 1305 (stating that while sentencing courts must consider § 3553(a), they are "not required to consider individually each factor listed in § 3553(a) before issuing a sentence").

■ Finally, because the guidelines in revocation (and now all) cases are advisory only, a sentence outside the advisory guideline range is not considered a "departure." *See, e.g., Marvin,* 135 F.3d at 1143 (holding that a deviation from § 7B1.4 is not a "departure," a conclusion "consistent with each and every circuit that has heretofore conclusively addressed this very issue"). Thus, courts imposing sentences higher or lower than the guideline range are not required to cite factors that take the case outside the heartland, but only to explain why the sentence imposed was necessary and reasonable in light of all of the relevant factors under § 3553(a). *See, e.g., United States v. Patton,* No. 04–6142, 118 Fed.Appx. 427, 430–31, 2004 U.S.App. LEXIS 25286, at *9–10 (10th Cir. Dec. 9, 2004) (holding that a sentence outside the chapter 7 range is not a departure, and that such a sentence need only be "reasoned and reasonable"); *United States v. White Face,* 383 F.3d 733, 738, 740 (8th Cir.2004) (8th Cir.2004) (holding that a sentence outside the § 7B1.4 range is not a departure, and rejecting defense argument that such sentence is proper only "when unusual factual circumstances are present");[1] *United States v. Cook,* 291 F.3d 1297, 1302 (11th Cir.2002) (affirming

---

**1.** The *White Face* court rejected the argument that under the PROTECT Act courts were required to provide a written statement of reasons for a sentence outside the § 7B1.4 range. 383 F.3d at 739. However, *Booker* left intact the § 3553(c) requirement that the court provide a written statement of reasons for any sentence outside the guidelines. *See Crosby,* 397 F.3d at 117.

sentence outside advisory range where district court found that § 3553(a) factors called for a different sentence); *United States v. Tadeo*, 222 F.3d 623, 626 (9th Cir.2000) (stating that while § 7B1.4 ranges must be considered, "unlike a sentencing guideline adopted by the United States Sentencing Commission, a policy statement setting forth a suggested sentencing range may be freely rejected by a district court without abusing its discretion, if the sentence actually imposed is within the statutory maximum"); *United States v. Shaw*, 180 F.3d 920, 922 (8th Cir.1999) (per curiam) (stating that because Chapter 7 serves a non-binding, advisory role, "a revocation sentence exceeding the suggested range is ... not an 'upward departure' because there is no binding guideline from which to depart"); *United States v. McClanahan*, 136 F.3d 1146, 1152 (7th Cir.1998) (holding that because "there is no sentencing 'departure' " when a court sentences outside the advisory range "the sentencing court is not required to provide notice that the sentence it contemplates may exceed the Table's range").

In the present case, I was called upon to apply the above-described methodology in sentencing defendant Marquis Roen after revoking his supervised release.

## II. FACTS

In 2003, defendant appeared before me on five counts of mail fraud arising out of a scheme he devised to defraud Northwestern Mutual Life ("NML") and dozens of vendors and merchants by writing checks on closed bank accounts. The scheme had two aspects. First, defendant induced NML to issue him loans against a life insurance policy, which he "repaid" with checks drawn on closed accounts at Northern Trust Bank ("NTB") and North Shore Bank ("NSB"). Defendant's scheme cost NML $19,254.82, the amount it loaned him less the value of the life insurance policy.

The second aspect of the scheme involved an account defendant opened at NTB after promising to wire $600,000 from a non-existent Swiss bank account. NTB gave defendant pre-printed checks, which he used to attempt to acquire various high priced items totaling $1,200,000. Because defendant never wired the money, NTB closed the account, none of the checks were honored, and defendant failed to obtain any goods. *United States v. Roen*, 279 F.Supp.2d 986, 986–87 (E.D.Wis.2003).

Defendant pled guilty to the charges, and the pre-sentence report ("PSR") recommended an offense level of 19 (base level 6, U.S.S.G. § 2B1.1(a), plus 16 based on the amount of loss, § 2B1.1(b)(1), minus 3 for acceptance of responsibility, § 3E1.1), and a criminal history category of VI. I overruled defendant's objection to the loss amount but granted him a downward departure of nine levels because that amount bore no relation to "economic reality." *Roen*, 279 F.Supp.2d at 987–92. With the departure, the range was 24–30 months, and I imposed a sentence at the low end. I also ordered defendant to pay $19,403.73 in restitution to NML.

In November 2004, the Bureau of Prisons released defendant, and he commenced three years of supervised release. The conditions of release included drug testing and treatment; no consumption of alcohol; monthly restitution payments; restrictions on employment with fiduciary responsibilities and the opening of new lines of credit or bank accounts; submission of monthly reports and financial information; cooperation with the Child Support Enforcement Unit; and mental health treatment.

Upon release, defendant immediately began lying to his probation officer. He reported that he had secured employment at "Magnus Group," a real estate firm, as an assistant director with a gross monthly

income of $5000. He reported that the firm was located at 250 East Wisconsin Avenue, Suite 1800 in Milwaukee and was directed by a John Engel. The probation officer conducted a field visit and found that the site consisted of a common reception area and a number of offices. The receptionist advised the probation officer that defendant was rarely present and that she had no knowledge of Mr. Engel. The probation officer ultimately discovered that defendant had leased the office in September 2004 while he was still in a halfway house and not permitted to lease property. When the probation officer questioned defendant about the arrangement, defendant first insisted that the real estate firm and Mr. Engel were legitimate. However, further probing by the probation officer disclosed the contrary, and defendant subsequently acknowledged that there was no company and no Mr. Engel, and that he had neither been employed nor received any income. Defendant also falsely reported to the probation officer that he had secured his own apartment and that he had made a child support payment to his ex-wife of $1500.

Defendant also failed to comply with other conditions of supervised release. He missed four urinalysis tests, although he later made them up. In January 2005, his roommate found him "passed out from intoxication" and observed several empty vodka bottles in the residence. Defendant subsequently admitted consuming alcohol. Although defendant was enrolled in alcohol and drug treatment at Silver Spring Psychotherapy Associates, he re-scheduled one appointment and missed another, and his counselor advised that he was unable to assess defendant's progress. Defendant also failed to submit a required monthly report and to make any restitution payments.

## III. APPLICATION OF SENTENCING PRINCIPLES

█ In sentencing defendant, I grouped the § 3553(a) factors into three categories: the nature of the violation, the history and character of the defendant, and the needs of the public and any victims. I also considered the sentencing range and policy statements promulgated by the Commission.

### A. Nature of Violations

Defendant's violations were not terribly serious in themselves because he committed no new crimes (although lying on his supervision report was a "B violation" under the guidelines). See 18 U.S.C. § 1001 (providing that any person who makes a materially false statement in any matter within the jurisdiction of the executive, legislative or judicial branches of government is subject to five years in prison); U.S.S.G. § 7B1.1(a)(2) (stating that Grade B violations include crimes punishable by a term exceeding one year). However, some of defendant's violations demonstrated disrespect for the conditions of his release and by extension disrespect for the law.

I considered lying to his probation officer to be the most serious violation. The fact that defendant started lying literally before he commenced supervised release indicated that he had no interest in making the relationship with the probation officer work. Further, defendant continued to lie about virtually every aspect of his life thus signaling that he did not intend to make a serious effort to solve his problems. It is virtually impossible for a probation officer to work with someone who continually lies to him even if the lies are the result of some delusion, as defendant's appeared to be. I considered the missed urinalysis tests less serious because defendant made them up and tested negative. I also was not particularly bothered by defendant's

drinking relapse. For those with substance abuse issues, relapses are "the rule during recovery rather than the exception, and should not be cause for undue alarm." *United States v. Maier,* 975 F.2d 944, 945 (2d Cir.1992). Nor was I concerned by his failure to make restitution and child support payments in view of the fact that he had only recently been released and had not found employment.

## B. History and Character of Defendant

Defendant had a very serious criminal record consisting of offenses involving dishonesty and deceit.[2] This history made his dishonesty to his probation officer that much more serious. In recent years, another federal judge revoked defendant's supervised release twice for fraud-related conduct and sentenced him to terms of 9 and 15 months. Defendant undoubtedly has substance abuse and mental health needs but appears unable or unwilling to address them.

## C. Needs of Public

Based on defendant's history and his conduct on supervised release, I concluded that he was a likely recidivist from whom the public needed to be protected. Defendant owed a substantial amount of restitution, but given his failure to make any payments while on release I did not consider it appropriate to discount the sentence to enhance his ability to pay. He can make payments under the Inmate Financial Responsibility Program.

## D. Advisory Guidelines

The guidelines in this case called for a prison term of 21–27 months (Grade of Violation B, Criminal History Category VI, U.S.S.G. § 7B1.4). I noted that the Commission issued a policy statement calling on courts to consider a sentence above the range if the original sentence resulted from a downward departure. U.S.S.G. § 7B1.4 cmt. n.4. As indicated, I departed downward by 9 levels in the original sentence.

## E. Sentence

After considering the above factors, I concluded that a sentence of 24 months in prison was sufficient but not greater than necessary to satisfy the purposes of sentencing. This sentence fell in the middle of the advisory guideline range. I would have sentenced defendant above the advisory range except for the fact that the violations themselves were not terribly serious. However, defendant's history and character, including his prior failures on supervision and the fact that sentences of 9 and 15 months after previous revocations did not make an impression, called for a sentence above the low end of the guideline range.[3] I imposed no further supervised release because I saw no purpose in additional supervision. This was a benefit to defendant, as his original supervised release term was three years. Thus, he will complete his obligations to the court sooner than if he had not been revoked. Finally, I reinstated defendant's restitution obligation.

---

**2.** Defendant was convicted of theft in 1990, drunk driving in 1995, contempt of court in 1996, forgery and theft by false representation in 1997, theft in 1997, forgery in 1997, and bank larceny in 1997.

**3.** Counts one, two, three and four were class D felonies, meaning that the maximum sentence after revocation was two years. However, count five was a B felony, meaning that the maximum sentence was three years. 18 U.S.C. § 3583(e)(3).