In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 23-2177 & 24-1089

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BRIAN FENNER and DENNIS BIRKLEY,

*Defendants-Appellants.*

---

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:18-cr-00333 — **Richard L. Young**, *Judge.*

---

ARGUED SEPTEMBER 13, 2024 — DECIDED JULY 1, 2025

---

Before EASTERBROOK, JACKSON-AKIWUMI, and KOLAR, *Circuit Judges.*

KOLAR, *Circuit Judge.* After a jury convicted Brian Fenner and Dennis Birkley at their joint trial, they appeal asking for a new one. They both argue the jury heard testimony that the Federal Rules of Evidence precluded. Fenner alone challenges the government's use of an inculpatory statement Birkley made to law enforcement, on the ground that its admission

violated his rights under the Confrontation Clause of the Sixth Amendment of the United States Constitution. They also both claim the district court erred in its restitution calculation at sentencing and Birkley alone brings an *ex post facto* challenge.

Many of these perceived errors went unobjected to at trial. Because the district court did not abuse its discretion in the evidentiary rulings it was asked to make, and our plain error review imposes a high bar for those it never considered, we affirm.

## I.  Background

On January 31, 2023, a jury convicted Brian Fenner and Dennis Birkley of seventeen counts, all stemming from one overarching fraud.[1] Like many fraud schemes, underlying the intricate machinations of this ploy is clear-cut malfeasance.

Under Indiana's mechanic's lien statute, an individual who does work on, tows, or stores a car at the owner's request establishes a lien on the vehicle for the value of their services. Ind. Code §9-22-6-2(a)–(b). If the owner cannot pay the lien, the mechanic has two paths for compensation. Other creditors, such as the company that financed the vehicle, can pay off the lien. If the creditors decline, the mechanic can put the vehicle up for auction. Ind. Code §9-22-6-2(c), (g).

The statute details the auction procedure. Ind. Code §9-22-6-2(c)–(e), (g). The mechanic lienholder must advertise the

---

[1] The convictions include one count of conspiracy to commit mail and wire fraud (Count 1), seven counts of wire fraud (Counts 2, 3, 5, 6, 8, 11, 14), six counts of mail fraud (Counts 4, 7, 9, 10, 12, 13) and three counts of money laundering (Counts 15–17).

auction in the newspaper, wait some time before holding the sale, and notify the owner and creditors of the sale. *Id*. If either the owner or creditors pay the mechanic's lien and claim possession of the car, the auction is off. *Id.* Otherwise, the sale occurs. *Id.* And critically for this scheme, the new buyer receives title for the vehicle free and clear of all pre-sale liens. *Id.* The sale extinguishes all prior interests. *Id.*

Fenner ran a towing company. He began a program where he marketed his towing services to attorneys representing financially distressed car owners on the brink of bankruptcy. Fenner would pay for the cost of bankruptcy, namely court and attorney fees, in exchange for the owner letting Fenner tow their vehicle to his lot. Fenner would charge not only for towing, but also storage, maintenance, and other administrative expenses. He would then obtain a mechanic's lien on the vehicle and sell it if neither the owner nor any creditor paid it off. For car owners expecting to lose their vehicle in impending bankruptcy proceedings anyway, Fenner offered a good deal.

Unbeknownst to the car owners, Fenner was not acting alone. Birkley was financing Fenner's costs—his marketing, towing, storage, and administration. Indeed, Birkley not only funded Fenner's bank account, he wrote checks from it. For instance, Birkley would pay the debtors' bankruptcy attorneys using checks from Fenner's bank account, sealed with a rubber stamp of Fenner's signature.

Importantly, none of the above constituted the charged fraud. The impropriety arose from a three-part deception. First, Fenner and Birkley conspired to disincentivize other lienholders (i.e. creditors) from paying off Fenner's liens. They did so by inflating the value of Fenner's liens beyond the

reasonable costs contemplated under the mechanic's lien statute. In one email exchange, Birkley asked Fenner, "How are we going to make money," to which he replied with a set of somewhat arbitrary costs, like multiplying the towing cost of $500 by 2.95 for no explicable reason and pondering "[w]hat else can we charge for." They also towed cars located across the country to Fenner's Indiana lot, making it harder for creditors to recover them.

If the creditors chose not to pay the inflated liens, then Fenner and Birkley moved on to the second part of their scheme—selling the vehicles at sham auctions. Recall, the Indiana statute still required Fenner to publicly advertise and hold an open auction. But while Fenner appeared to schedule sales, they never actually occurred. He set the auctions for preposterous hours, like 1:30 am on Christmas Eve, Christmas Day, and New Year's Eve, to ensure that nobody showed up. And when some people did try to attend auctions scheduled at the more reasonable hour of 6:30 am, they testified to finding a padlocked parking lot with no signs of activity or attendees. Documentary evidence corroborated the fiction. In one instance, Fenner shipped vehicles to Birkley's business in Wisconsin four days before they were set to be auctioned off, suggesting Fenner never intended to hold a true sale.

Unsurprisingly, Birkley, the only person in on the scheme, summarily "won" every sale. This too was a lie. At every auction, Birkley conveniently bought the vehicles for the cost of the mechanic's lien, ensuring that other creditors received zero proceeds. Except Birkley never paid Fenner a dime. No money changed hands.

With the procedures papered over, Birkley executed the final stage of the scheme. He filed for clean titles with the

Indiana Bureau of Motor Vehicles (BMV). To obtain them, he needed to lie in the applications. Birkley falsely claimed that he received the vehicles after legitimate auctions and had paid the auction prices in cash. He also lied about his company's involvement in the scheme before the auction, making it appear as though he purchased the cars in an arm's length transaction.

All in all, Birkley "bought" around 100 vehicles this way, which he and Fenner then flipped for just over one million dollars.

The scheme caught up with them when one of the creditors, a Ford subsidiary, sued. The Indiana Superior Court enjoined Fenner and Birkley from continuing their scheme because they violated the mechanic's lien statute by failing to follow notice and timing procedures. *Sperro LLC v. Ford Motor Credit Co. LLC*, 64 N.E.3d 235, 247–49 (Ind. Ct. App. 2016). The BMV then tipped off law enforcement, who eventually indicted Fenner and Birkley for seventeen federal offenses.

Testimony at trial from four government witnesses is relevant for this appeal. First, Special Agent Kathryn Graham summarized a large volume of admissible business records. Graham opined that the reason Fenner scrubbed Birkley's involvement in his initial overtures to bankruptcy attorneys and on the BMV applications was to conceal Birkley's involvement in the scheme. She also believed that "the effect" of Fenner paying one of the bankruptcy attorneys with Birkley's money was to conceal Birkley's participation. And she testified that finding checks for Fenner's bank account on Birkley's property indicated that Birkley "maintained these checks to use them for whatever was needed." Birkley objected to Graham's testimony as improper opinion testimony as to Fenner

and Birkley's motives and intent. The objection was over-ruled.

Second, FBI forensic accountant Kathryn Kanetzke was called to summarize Fenner and Birkley's bank records. The government did not qualify her as an expert witness. Ka-netzke reviewed "over tens of thousands" of pages of bank records for Fenner and Birkley's businesses. Using a spread-sheet Fenner and Birkley created, she traced the flow of money through bank accounts, expense sheets, and emails. From this review, she testified that Birkley was funding the bankruptcy attorney fees and petitions, not Fenner. She also told the jury that Birkley never actually paid Fenner for the cars and received at least some vehicles before the purported auction dates. At the close of her testimony, Kanetzke summed up that Fenner and Birkley received "gross receipts of approximately $1 million" from their scheme. The trial judge overruled Fenner and Birkley's objection that Kanetzke offered unnoticed expert testimony.

Finally, the government introduced an out-of-court state-ment that Birkley made during a pre-indictment interview with law enforcement. Here, Birkley admitted to two law en-forcement officials, who testified at trial, that he paid the bankruptcy fees. When pressed why he used Fenner's account to pay them, Birkley said he wanted to conceal his involve-ment. Turning to the auctions, Birkley told the officers he at-tended one auction, that "it was really a prearranged deal that they already had that he would get the vehicles" and that "[t]here was really no purchase, and there was no money ex-changed."

Fenner did not object to this testimony. At the close of trial, the district judge included a limiting instruction that the jury

"may not consider the statement of defendant Birkley as evidence against Fenner." Fenner agreed with this instruction. The jury convicted Fenner and Birkley on all counts.

The district court sentenced Fenner and Birkley to 70 months and 60 months in prison, respectively, and ordered $49,045.84 in restitution jointly and severally. The restitution calculation tracked the figure in the presentence report, which summed up the claimed losses of creditors who held liens on vehicles fraudulently sold by Fenner and Birkley. The creditors' losses were supported with exhibits submitted to the district court. Three creditors sought restitution for the remaining values of the car loans they held, which were lost once the BMV granted Birkley clean title. Another requested the loan value minus a partial settlement payment it had received. The final creditor sought reimbursement for costs to recover its vehicle from Fenner's lot. Fenner agreed with the restitution figure while Birkley objected.

## II. Analysis

There are five issues on appeal. Fenner and Birkley argue that the district court abused its discretion on two evidentiary calls—allowing Kanetzke to give expert testimony without qualification and Graham to testify to Fenner and Birkley's intent. Fenner separately contends that Birkley's unredacted inculpatory statement to law enforcement violated his Sixth Amendment right to confront witnesses. Finally, Birkley argues he was convicted and sentenced in violation of the *Ex Post Facto* Clause of the Constitution and Fenner and Birkley both challenge the restitution calculation. We address the arguments in turn.

### A. Kanetzke's Testimony

We review a district court's decision to admit or exclude evidence for an abuse of discretion. *United States v. Lopez*, 870 F.3d 573, 577 (7th Cir. 2017).

As a summary witness, Kanetzke was required to "draw conclusions from the evidence presented at trial." *Id.* (citation omitted). Everyone agrees that the underlying documents Kanetzke summarized—bank records, communications, and spreadsheets of sales—were admissible. The only question is whether Kanetzke's summary opinions crossed over into expert testimony at trial.

Rule 701 of the Federal Rules of Evidence, which circumscribes lay witness testimony, says "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Rule 702 then outlines the more rigid demands of expert testimony, namely that a qualified expert in a subject area may generate an opinion so long as "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

The distinction is not between "expert and lay *witnesses*, but rather between expert and lay testimony." *United States v.*

*Christian*, 673 F.3d 702, 709 (7th Cir. 2012) (citation omitted). As illustration, a medical doctor is not a *per se* expert witness—she may offer lay testimony when relaying that she saw the traffic light turn red but veers into expert territory when opining on the medical injuries resulting from the car accident. Similarly, a law enforcement officer's "testimony is a lay opinion if it is 'limited to what he observed or to other facts derived exclusively from a particular investigation.'" *United States v. Gaytan*, 649 F.3d 573, 582 (7th Cir. 2011) (quoting *United States v. Oriedo*, 498 F.3d 593, 603 (7th Cir. 2007)) (cleaned up). Testimony becomes expert—and subject to Rule 702's qualifying procedures—when an officer "brings the wealth of his experience as an officer to bear on those observations and makes connections based upon that specialized knowledge." *United States v. Malagon*, 964 F.3d 657, 662 (7th Cir. 2020). Here, Kanetzke confined her testimony to the documents and communications in the closed record of the investigation that led to the charges in this case.

Deploying basic arithmetic of addition and subtraction, even repeatedly, is often within the realm of lay, not expert, testimony. *See United States v. Davis*, 53 F.4th 833, 848–49 (5th Cir. 2022) (collecting cases from sister circuits holding the same). While the "*volume* of math" Kanetzke performed was large, the method was simple. *Id.* In forming her opinions that Birkley was funding Fenner's bank account, she noted Birkley never paid cash for the vehicles at auction, and Fenner and Birkley raked in over one million dollars through the scheme. This was Kanetzke performing rudimentary math. To reach the revenue figure, Kanetzke added up the total reported sales of the 100-plus vehicles sold. Her opinion that Birkley funded the operation came by observing Birkley deposit tens of thousands of dollars in Fenner's bank account, and Fenner

issuing checks to various bankruptcy attorneys for similar amounts shortly after. And she concluded Birkley did not pay Fenner for the vehicles because he never listed the purported auction price as an expense, nor did bank records show him paying Fenner the purchase prices. Her testimony, cabined to this particular investigation, required attention to detail; it did not require expertise beyond the ken of a lay person.

That simplicity is in marked contrast to the case Fenner and Birkley principally rely on. In that case, *United States v. White*, trial testimony discussing the "structure of the Medicare program generally," the meaning of "reasonable costs" within that field, and the witness's understanding of "various Medicare concepts" was expert in nature. 492 F.3d 390, 399–400 (6th Cir. 2007). Kanetzke's testimony put numbers together from the documents she reviewed. Elementary level math is the definition of "lay testimony result[ing] from a process of reasoning familiar in everyday life." *United States v. Thomas*, 970 F.3d 809, 813 (7th Cir. 2020) (quoting Fed. R. Evid. 701 Committee Note on Rules—2000 Amendment (quotations omitted)). The trial court did not abuse its discretion.

### B. Graham's Testimony

Like Kanetzke, Graham testified as a lay summary witness subject to Rule 1006. *See* Fed. R. Evid. 1006 (allowing admission of "a summary, chart, or calculation offered to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court, whether or not they have been introduced into evidence"). Summary witnesses may testify to what "the Government's evidence shows," but cannot offer implausible or speculative inferences from those records. *United States v. Pree*, 408 F.3d

855, 869 (7th Cir. 2005) (allowing summary witness to assume a plausible inference from the record evidence).

Summary witnesses should tread carefully when opining on a defendant's intent. *See United States v. Guzzino*, 810 F.2d 687, 699 (7th Cir. 1987); *United States v. Jackson*, 569 F.2d 1003, 1011 n.17 (7th Cir. 1978). In *United States v. Lopez*, we found no error in the witness's testimony, but in doing so, highlighted that she did not "offer any testimony or opinion as to why [the defendant]" did what he did or "the intent behind" his actions. 870 F.3d at 577. At the same time, we have also underscored that "even lay opinion testimony as to the mental state of another is indeed" admissible from non-expert witnesses. *United States v. Locke*, 643 F.3d 235, 239–40 (7th Cir. 2011) (quotations omitted and citations omitted).

Fenner and Birkley take issue with much of Graham's testimony. Most of it was clearly proper, summarizing the content of voluminous financial documents and communications from and between Fenner and Birkley. Contrary to their contentions, Graham never concluded that Fenner inflated the value of his liens—she identified specific documents showing Fenner sometimes listed the cost to tow a vehicle as over double the amount he actually paid for that service. But she never opined that these costs were "fake" or "illegal." It was left for the jury to consider whether they reflected the "reasonable value" of services provided under the mechanic's lien statute. Ind. Code §9-22-6-2(a)–(b).

One challenge is perhaps a slightly closer call. On direct, Graham repeatedly testified to Fenner and Birkley's motivation. Evaluating her testimony on the whole, she believed the reason why Birkley, who was financing the bankruptcy attorney fees, never directly reached out to the attorneys was to

hide his involvement and cast the later "auction sales" as the result of an arm's length transaction.

Even if the district court did abuse its discretion in allowing this testimony, such error was harmless because "it did not have a substantial influence on the verdict." *United States v. Medrano*, 83 F.4th 1073, 1078 (7th Cir. 2023) (citation omitted). That is, the prosecution's case would not have been "significantly less persuasive" without Graham's concealment testimony. *United States v. Curtis*, 781 F.3d 904, 911 (7th Cir. 2015).

The evidence of concealment was overwhelming. Extensive and detailed documents showed that Birkley financed the entire operation, while Fenner presented as the frontman. One of Birkley's employees testified about gaining access to Fenner's bank accounts, signing checks in his name, and routing funds from Birkley's account to appear as coming from Fenner. Not only did defense counsel have free rein to cross-examine Graham on her testimony, Fenner testified to his alternative "non-concealment" reason for omitting Birkley from the documents. *See Christian*, 673 F.3d at 711–12 (highlighting importance of cross-examination in harmless error analysis). Fenner claimed that erasing Birkley's involvement was a matter of "professionalism" because it was Fenner's company that did the outreach, towing, and "auctions." The jury did not buy that alternative. Instead, it made a different and compelling inference from the record evidence—that Fenner and Birkley wanted to hide Birkley's involvement in the "auction" activity.

### C. Birkley's Statement to Law Enforcement

For the first time on appeal, Fenner argues that Birkley's unredacted statement to law enforcement violated his Sixth Amendment rights.[2] Because Fenner failed to object at trial, we review for plain error only. Fed. R. Crim. P. 52(b); *United States v. Haas*, 37 F.4th 1256, 1264 (7th Cir. 2022). Fenner must show that (1) there was an error, (2) the error was clear or obvious, and (3) there is "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Greer v. United States*, 593 U.S. 503, 507–08 (2021) (citation omitted). If those three requirements are satisfied an appellate court retains discretion to grant relief if the error had a "serious effect on 'the fairness, integrity, or public reputation'" of the trial. *Id.* at 508 (quoting *Rosales-Mireles v. United States*, 585 U.S. 129, 135 (2018) and citing *United States v. Olano*, 507 U.S. 725, 735–37 (1993)). The defendant "faces a 'difficult' burden" to satisfy all four elements. *United States v. Page*, 123 F.4th 851, 864 (7th Cir. 2024) (en banc) (quoting *Greer*, 593 U.S. at 508). For the sake of completeness, we address several prongs, but we emphasize our holding rests on our conclusion that there is no "reasonable probability" the admission of the statement affected Fenner's conviction, and that even if it did, that would not constitute a serious effect on the fairness of the trial.

To determine if there was an error under prong one, we must begin with the substantive law at play. The Sixth Amendment's Confrontation Clause "forbids the introduction of out-of-court 'testimonial' statements unless the

---

[2] Only Fenner can raise this challenge, as Birkley's statement was undisputedly admissible against him.

witness is unavailable and the defendant has had the chance to cross-examine the witness previously." *Samia v. United States*, 599 U.S. 635, 643 (2023). Normally, an instruction directing the jury not to consider a witness's out-of-court testimony against his codefendant is sufficient to mitigate any harm. *Id.* at 644. However, a "narrow exception" to this presumption exists "when the facially incriminating confession of a nontestifying []defendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the []defendant" who made the statement. *Richardson v. Marsh*, 481 U.S. 200, 207 (1987) (citing *Bruton v. United States*, 391 U.S. 123, 135–36 (1968)).

The prototypical scenario, established in *Bruton v. United States*, occurs when a nontestifying defendant confesses to committing a crime and explicitly names his codefendant as an accomplice. 391 U.S. at 124–25. The "risk that the jury will not, or cannot, follow [limiting] instructions is so great, and the consequences of failure so vital to the [co]defendant," that such unredacted confessions are constitutionally inadmissible. *Id.* at 135. But critically, only confessions that "expressly implicat[e]" the codefendant as a conspirator fall under this rule. *Id.* at 124 n.1. A confession that does "not incriminat[e] on its face, and [does] so only when linked with evidence introduced later at trial," may be introduced at a joint trial subject to a limiting instruction. *Richardson*, 481 U.S. at 208. The question for the reviewing court is whether the confession is a "vivid" statement that the two defendants committed a crime together or only damaging to the codefendant through "inferential incrimination." *Id.*

"But inference pure and simple cannot make the critical difference" without more. *Gray v. Maryland*, 523 U.S. 185, 195

(1998). The admissibility of the statement "must depend in significant part upon the *kind* of, not simple *fact* of, inference." *Id.* at 196. Accordingly, the Supreme Court has repeatedly considered the appropriateness of "confessions" from nontestifying defendants that the government modified or redacted to omit the codefendants' names. *See, e.g.*, *Richardson*, 481 U.S. at 203–04 (no *Bruton* violation when confession omitted "all indication that" codefendant was involved in crime); *Gray*, 523 U.S. at 196 (*Bruton* violation when redacted confession said that "Me, deleted, deleted, and a few other guys" committed the offense because the "prominent" blanks were "facially" incriminating); *Samia*, 599 U.S. at 651–53 (no *Bruton* violation when codefendant's name changed to a "neutral reference[] to some 'other person'" in nontestifying defendant's confession).

Together, *Bruton* and its progeny make clear that we must not myopically train our gaze on the explicit naming of a codefendant in the statement but rather decide holistically if the statement was "facially incriminating" against the codefendant (meaning it cannot be introduced), or one that requires "linkage" to other "evidence introduced later at trial" to gain incriminating value (meaning it is admissible with the offer of a limiting instruction). *Richardson*, 481 U.S. at 207–09; *Samia*, 599 U.S. at 650.

Drawing that line is not always easy. On one end, a direct confession akin to "I committed the crime with John" would be inadmissible even with an instruction. But "navigat[ing] these murky waters" requires a "delicate determination" of "case-by-case consideration rather than a brightline rule." *United States v. Green*, 648 F.3d 569, 575–76 (7th Cir. 2011).

*United States v. Stockheimer* is instructive. 157 F.3d 1082 (7th Cir. 1998). In that case, which involved an organization engaged in a complex fraud scheme, the government introduced a defendant's statement that we assumed clearly implicated two other codefendants' involvement in the organization. *Id.* at 1086–87. Nonetheless, we found no *Bruton* violation because participating in the organization was not facially incriminating, but damning only "in conjunction with other evidence introduced at trial" about the organization's malfeasance. *Id.*[3] And in other instances, we have concluded that an inculpatory statement that fell short of full-blown confession "to the crimes with which [the nontestifying defendant] was charged" and that was consistent with the codefendant's "theory of defense" was not "powerfully" incriminating. *United States v. Briscoe*, 896 F.2d 1476, 1501–03 (7th Cir. 1990); *see also United States v. Cirrincione*, 780 F.2d 620, 632–33 (7th Cir. 1985) (no *Bruton* violation when statements from nontestifying defendants were "obviously not confessions," "fit [the codefendant]'s trial strategy," and "were merely cumulative of other evidence"); *United States ex rel. Cole*, 752 F.2d 1210, 1215–17 (7th Cir. 1985) (nontestifying defendant's statement that codefendant was at the scene of the crime did not violate *Bruton* since codefendant admitted the same at trial).

---

[3] The government did redact the codefendants' names from the statement in *Stockheimer* to refer only to "an inner circle of persons that were members of [the organization]." 157 F.3d at 1086. Still, we read the decision as turning not on the redaction—we "assume[d] the jury immediately concluded that [the codefendants] belonged to the inner circle" described—but the fact that membership in the "inner circle" was only incriminating in conjunction with evidence of the organization's fraudulent activities. *Id.* at 1086–87.

Birkley attended a pre-indictment meeting, with his counsel present, presumably to explain his side of the story. There, he admitted three things: (1) he wanted to conceal his financing of the operation, (2) he did not pay Fenner for the cars, and (3) the auctions were prearranged affairs. That story largely matched Fenner and Birkley's defense theory at trial. *Briscoe*, 896 F.2d at 1502–03 (no *Bruton* violation when admissions were not in dispute and consistent with defense theory). Indeed, Fenner testified that he had a "floor plan" arrangement with Birkley where he advanced Birkley the vehicles— on credit—and only received his share of the compensation after Birkley sold them. That arrangement mirrors Birkley's statement. We strain to see Fenner's issue with letting the jury hear about the prearranged auctions and lack of exchanged money "since he admitted" this in his own testimony. *Cirrincione*, 780 F.2d at 633.

None of the above should be taken as blanket approval of the government's decision to keep Fenner's name in Birkley's statement. While the statement did not admit to the charged crimes, its suggestions that there were no genuine sales supported the government's theory of liability. We have never held that a statement short of express acceptance of liability is immune from a *Bruton* challenge. *See United States v. Jett*, 908 F.3d 252, 275 (7th Cir. 2018) (drawing line between "suggestive" statements and those so "facially and 'powerfully incriminating' as to be considered" confessions (quoting *United States v. Volpendesto*, 746 F.3d 273, 291 (7th Cir. 2014)). But while the unredacted statement could have proved at odds with Fenner's theory, it is not clear that is how the trial played out. And we must decide the case on the record, and defense, before us. We need not draw the precise line between suggestive statements and those facially and powerfully

incriminating in this case. All that would reveal is whether there was "error," and that is unnecessary to resolve this appeal.

Moving to the second prong, we stress any error must be "clear or obvious." *Molina-Martinez v. United States*, 578 U.S. 189, 195 (2016). Mistakes that rest on "'subtle, arcane, debatable, or factually complicated' distinctions fall outside that set." *United States v. Brasher*, 105 F.4th 1002, 1007 (7th Cir. 2024) (quoting *United States v. Hopper*, 11 F.4th 561, 572 (7th Cir. 2021)). Misevaluating the facially versus inferentially incriminating value of Birkley's statement, a "subtle" line-drawing exercise in the first instance, is doubly hard in the context of a multi-year fraud where no single act was the smoking gun. *Green*, 648 F.3d at 575. More simply, guilt did not rise or fall on proof of a discrete event subject to straightforward evidence, like a bank robbery. *Cf. Jett*, 908 F.3d at 259–60, 274–75 (defendant admitting he was "joyriding … fleeing" was not a confession that he was conspiring to commit a bank robbery). Additionally, Fenner adopted much of Birkley's statement when he testified to the "floor plan" agreement, softening our view of its incriminating value. *Briscoe*, 896 F.2d at 1502–03 (no *Bruton* violation when statement was consistent with codefendant's "theory of defense").

The government needed to prove multiple actions, innocuous in isolation but collectively illicit. The government's theory, laid plain in its closing, makes the multi-step nature of the inquiry clear:

> Why does [the fact that there were no auctions] matter? Because if there is no purchase, they don't get the bank's lien washed off. If they don't get the bank's lien washed off, they don't have clean title to the vehicle. If

they don't have clean title to the vehicle, they can't re-sell the vehicle for a profit.[4]

Only if the jury pieced each of these inferences together could they arrive at a guilty verdict.

In this "factually complicated" scenario, *Brasher*, 105 F.4th at 1007 (quoting *Hopper*, 11 F.4th at 572), Fenner faces a high burden to show that any "error was so plain the trial judge and prosecutor were derelict" in allowing it. *Page*, 123 F.4th at 866 (quoting *United States v. Frady*, 456 U.S. 152, 163 (1982) (citation omitted)).

Moving to the third prong, which we find dispositive and constitutes part of our plain error holding,[5] even if there was error and that error was plain, there is no reasonable probability that the error affected the jury's verdict against Fenner. *Greer*, 593 U.S. at 507–08. To reiterate, Birkley told law enforcement (1) he wanted to conceal his financing of the operation, (2) he did not pay Fenner for the cars, and (3) the auctions were prearranged affairs. First, as noted in section II.B, the documentary and witness evidence of Birkley's concealment was overwhelming. The second and third admissions were similarly obvious from other evidence presented. Birkley's extensive financial documents omitted any line-item expense for purchasing the hundred-odd vehicles from Fenner, standing in sharp relief to Birkley's meticulous record-

---

[4] The intricate multi-year deception led the district court to apply a "sophisticated means" enhancement at sentencing, referring to the scheme as "more than just your average fraud."

[5] As discussed *infra*, we also hold any error does not affect the "fairness, integrity, or public reputation" of judicial proceedings. *Rosales-Mireles v. United States*, 585 U.S. 129, 143 (2018).

keeping of *bona fide* expenses, like towing and storage costs. Plus, Fenner testified that his "floor plan" agreement with Birkley meant Birkley would not pay him for the cars until *after* Birkley sold them. He admitted there was no money exchanged at the time of the transfers.

Strong evidence also supported that the auctions were fabrications. Multiple witnesses attempted to attend several auctions only to find locked parking lots and buildings with the lights off. Documents exchanged between Fenner and Birkley revealed that Fenner transferred vehicles to Birkley four days before they were set to be sold. And remember, Fenner scheduled some of the purported auctions for preposterous hours on Christmas Eve, Christmas, and New Years Eve. The government's searing cross-examination of Fenner on these topics no doubt swayed the jury. When Fenner was cross-examined on why he never brought up having a business relationship with Birkley in prior sworn testimony,[6] and chose to raise the "floor plan" defense for the first time at trial, he offered the rather weak response that he was "not asked" about his relationship with Birkley. It is a "fundamental premise of our criminal trial system ... that the *jury* is the lie detector" and was entitled to find Fenner's explanation not credible. *United States v. Scheffer*, 523 U.S. 303, 313 (1998).

Finally, we also hold that any potential error would not compel our review to correct the "fairness, integrity, or public reputation" of judicial proceedings. *Rosales-Mireles*, 585 U.S.

---

[6] Fenner agreed to sit for a deposition in a separate civil suit that preceded the criminal trial. *Sperro LLC v. Ford Motor Credit Co. LLC*, 64 N.E.3d 235, 238 (Ind. Ct. App. 2016). On Fenner's cross at trial, the government introduced parts of this prior testimony without objection.

at 143 (2018). Appellate courts are to exercise the power to overturn verdicts on plain error review "sparingly." *Jones v. United States*, 527 U.S. 373, 389 (1999). Several considerations weigh against its use here. First, review and reversal would require a new trial, which imposes a relatively heavy cost. *Rosales-Mireles*, 585 U.S at 140, 142–43. Second, the argued error was born out of counsel's failure to object, not the trial judge's misbehavior. *Id.* at 140, 144 (suggesting errors stemming from decisions the trial court "is charged in the first instance with determining" are more apt for review than "trial strategies" that retrospectively appear erroneous). More importantly, "in most circumstances, an error that does not affect the jury's verdict does not significantly impugn the 'fairness,' 'integrity,' or 'public reputation' of the judicial process." *United States v. Marcus*, 560 U.S. 258, 266 (2010). Fenner's admitted testimony largely reinforced Birkley's statement, minimizing our concern that Birkley's statement swayed the jury. Fenner had a colorable reason for failing to object—to buttress his own testimony as corroborative—diminishing our appetite to review any "error" that was quite possibly a deliberate choice from counsel.

And we must also remember that *Bruton* is grounded in the Sixth Amendment's right to confront—i.e. cross-examine—witnesses. *See generally Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (opportunity to cross-examine witnesses essential to Sixth Amendment). That right, save "the exceptional cases in which counsel is ineffective," includes "the lawyer's [tactical] decision to forgo cross-examination." *Taylor v. Illinois*, 484 U.S. 400, 418 (1988). Outside of ineffective assistance of counsel claims, which are best left for collateral review, *Massaro v. United States*, 538 U.S. 500, 504–05 (2003), a defendant faces a steep hill to climb when attempting to

establish a constitutional violation based upon a decision to choose one trial strategy at the expense of another. In cases of later-challenged omissions, we first ask whether the omission, say failing to cross-examine, was intentional—in which case we will not review it as waived—or negligent—in which case we review only for plain error. *United States v. Gibbs*, 130 F.4th 619, 622 (7th Cir. 2025). The government has not argued waiver, so we have proceeded under plain error review.

But in weighing our discretion to grant relief based on the fairness, integrity, and public reputation of the courts, we find it relevant that Fenner did not lodge an objection premised on a trial right vested to him. This is analogous to a decision not to cross-examine a witness. Take a situation where Birkley was a testifying witness instead of a codefendant who exercised his right not to testify. Fenner could have either opted to take his statement as it was, perhaps thinking it did no harm to, or perhaps even corroborated, his defense. Or, Fenner could have decided to cross-examine Birkley. Here, Fenner had good reason to leave Birkley's statement undisturbed, received a fair trial, and had a relatively weak defense. We see no reason to question the fairness or integrity of the conviction. Because we find the district court did not make multiple—plain or preserved—errors at trial, we necessarily reject Fenner and Birkley's cumulative error argument. *United States v. Groce*, 891 F.3d 260, 270–71 (7th Cir. 2018).

### D. The Remaining Alleged Errors

Birkley alone advances an *ex post facto* argument. It does not hold water. The Constitution forbids a state from "passing *ex post facto* laws—those that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.'" *Nelson v. Town of Paris*, 78 F.4th 389, 395 (7th Cir. 2023) (quoting

*Collins v. Youngblood*, 497 U.S. 37, 43 (1990)). We review *de novo* whether a law is both retroactive and punitive. *United States v. Arojojoye*, 753 F.3d 729, 736 (7th Cir. 2014).

Birkley believes his conviction violates the *Ex Post Facto* Clause because the Indiana mechanic's lien statute introduced at trial became effective January 1, 2015, when the alleged conspiracy had begun in August 2013. The version in effect from 2013 to 2015 was identical with respect to the procedural requirements for a mechanic lienholder wishing to auction a vehicle. Ind. Code Ann. §9-22-6-2 (2012 version).

Birkley's argument fails because he was neither convicted nor "sentenced pursuant to the suspect provision," the mechanic's lien statute. *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir. 2007). It is true that part of the fraud involved the statute, including showing that Birkley lied on the BMV applications. But his convictions and sentence are the product of seventeen violations of federal, not Indiana law.

Finally, we affirm the district court's restitution calculation. The Mandatory Victim Restitution Act (MVRA) requires defendants "make restitution to the victim of the offense." 18 U.S.C. §3663A(a)(1). Because wire and mail fraud convictions are offenses that "involve[] as an element a scheme [to defraud], conspiracy, or pattern of criminal activity," a court must order restitution to "any person directly harmed by the defendant's criminal conduct in the course of" their fraud. *Id.* §3663A(a)(2); *United States v. Griffin*, 76 F.4th 724, 749 (7th Cir. 2024). The purpose is to "fully compensate these victims for their losses." *Griffin*, 76 F.4th at 749 (citation omitted). "[R]estitution for victims of the overall scheme is required." *United States v. Meza*, 983 F.3d 908, 918 (7th Cir. 2020) (quotations and citation omitted).

In cases "involving stolen property," sentencing courts must "order return of the property to the victim," or if that is not possible, "compel the defendant to pay the value of the property less the value of any property already returned." *United States v. Anderson*, 866 F.3d 761, 765 (7th Cir. 2017) (citing 18 U.S.C. §3663A(b)).

The government must establish the restitution amount by a preponderance of the evidence. *United States v. Robl*, 8 F.4th 515, 527 (7th Cir. 2021). In arriving at the correct figure, a court "may rely on information provided in the presentence report 'so long as it is well supported and appears reliable.'" *Id.* at 529 (quoting *United States v. Scalzo*, 764 F.3d 739, 745 (7th Cir. 2014)). The defendant has the burden to show that the proposed restitution amount in the presentence report is "inaccurate or unreliable, and a simple denial of its accuracy does not discharge this burden." *Griffin*, 76 F.4th at 750 (quoting *Scalzo*, 764 F.3d at 745).

The district court did not plainly err in its restitution assessment.[7] Three creditors submitted losses for the value of

---

[7] While Fenner's brief (which Birkley adopts) argues for plain error review, he may have waived this argument outright. We have previously addressed when a litigant waives versus forfeits an argument for appeal. *United States v. Hernandez*, 44 F.4th 1053, 1057–58 (7th Cir. 2022). "Waiver occurs when a party intentionally relinquishes a known right and forfeiture arises when a party inadvertently fails to raise an argument in the district court." *United States v. Flores*, 929 F.3d 443, 447–49 (7th Cir. 2019). Waived issues cannot be appealed but forfeited arguments are reviewable for plain error. *United States v. Harris*, 102 F.4th 847, 851 (7th Cir. 2024). A defendant performs a "textbook waiver" of a sentencing error when he expressly tells the court he does not object to the relevant factual finding. *United States v. Coffin*, 23 F.4th 778, 780–81 (7th Cir. 2022). Fenner's conduct is on all fours with the defendant in *Harris*, who waived his argument when he "was 'expressly invited' to object, and 'expressly declined' to do

the unpaid car loans on the vehicles before Fenner and Birkley extinguished their property interests through the fraudulent titling process ($34,663.70). Another creditor's reported loss was also an unpaid loan minus a partial settlement it received ($8,392.14). And the final creditor's loss was the cost to pay off Fenner's inflated lien and tow its vehicle from Fenner's lot in Indiana back to Abilene, Texas ($5,990.00).

The four creditors that lost the value of their liens on vehicles had a right to recover the amount owed on those cars, but for the defendants' direct actions. To the extent Fenner argues the loan values should reflect the amount the creditors could have realistically expected to recover from distressed debtors, we hold that the district court's decision on this nuanced point was not plain error. *See United States v. Eaden*, 37 F.4th 1307, 1315 (7th Cir. 2022) (district court's restitution calculation that depended on, but failed to parse out the amount of illegally inflated profits from legal profits was not plain error). Neither Fenner nor Birkley proposed an alternative amount for the "true" value of the liens beyond their "simple denial[s] of [their]" accuracy on appeal. *United States v. Fennell*, 925 F.3d 358, 362 (7th Cir. 2019) (quotations omitted). Despite Fenner's bare protest, it is quite possible the creditors

---

so, confirming that he had no objection and expressly *affirming* the accuracy of [the restitution amounts] in the PSR." 102 F.4th at 852 (quoting *United States v. Lewis*, 823 F.3d 1075, 1079 (7th Cir. 2016)). That matches Fenner's proceeding, and "[t]hat was waiver." *Lewis*, 823 F.3d at 1079. Nonetheless, because Birkley's objection is concededly subject to plain error review and the government has waived its waiver argument against Fenner on appeal, we review both claims for plain error. *United States v. Stapleton*, 56 F.4th 532, 541 (7th Cir. 2022).

would have recovered the remaining value of their liens through subsequent sales or from the debtor directly. In any event, the restitution amount "must be based on actual losses" and can only be reduced by actual money returned to the property holder, not "speculative" adjustments. *United States v. Burks*, 678 F.3d 1190, 1198–99 (10th Cir. 2012) (value of insurance policy for vehicle, not alleged fair-market value of car, was proper restitution amount).

The fifth victim was also properly compensated. That creditor chose to pay the inflated mechanic's lien and bring its vehicle back to Texas. The district court properly pegged restitution to the cost of Fenner's fraudulent services and remedial towing cost. It is irrelevant that some of the mechanic's lien consisted of real towing costs because the vehicle never would have been towed from Abilene to Indiana if not for Fenner's fraud. *Cf. United States v. Navarrette*, 667 F.3d 886, 889–91 (7th Cir. 2012) (where "the only effect of the fraud is to transfer business between two sellers whose prices and quality are the same," a court must segregate real services from inflated costs); *see also United States v. Coriarty*, 300 F.3d 244, 253–54 (2d Cir. 2002) (when lost money in fraud consisted of "commingling" of legitimate expenses and fraud, restitution could encompass entire valuation). The creditor was due recovery of the money it had to pay to return to the position it was in before Fenner and Birkley needlessly brought the vehicle across the country.

### III. Conclusion

For the foregoing reasons, the convictions and judgments as to Fenner and Birkley are **AFFIRMED**.

JACKSON-AKIWUMI, *Circuit Judge*, concurring in part. I join the majority opinion in every respect except for the analysis in Section II.C. That section concerns the government's use at trial of an inculpatory statement Fenner's co-defendant Birkley made to law enforcement. Fenner argues that the use of Birkley's statement violated Fenner's rights under the Sixth Amendment's Confrontation Clause. I agree with my colleagues' ultimate conclusion in Section II.C., which is that Fenner has failed to meet his burden under the third prong of plain error review to show he was harmed by the admission of Birkley's statement given the overwhelming evidence against Fenner. *See ante*, at 19–21. That conclusion is clear and dispositive, in my view. I do not join the rest of Section II.C., which goes beyond the question of harmlessness into a discussion of the Supreme Court's *Bruton* jurisprudence and aspects of the trial record I see differently than my colleagues. *See ante*, at 13–19, 21–22.